James Lester, Minor, by Troy Lester, His Father and Next Friend, Appellee, v. Peter Bugni et al., Appellants.

Gen. No. 9,338.

Heard in this court at the February term, 1942. Opinion filed May 20, 1942. Rehearing ·denied October 6, 1942.

SNELL & SEYFRIT, of Carlinville, and ROBERT W. JOHNSON and EARL S. HODGES, both of Springfield, for appellants.

JESSE PEEBLES and E. R. PHELPS, both of Carlinville, and MARK O. ROBERTS, of Springfield, for appellee.

MR. JUSTICE RIESS delivered the opinion of the court.

The defendant appellants Peter Bugni and Roy Donelson each operated a tavern in or near Carlinville, Illinois, wherein intoxicating liquors were sold. The defendant appellant Eugene Bates was the owner of the tavern operated by Donelson. Suit had been filed in the circuit court of Macoupin county by James Lester, a minor, aged seventeen years, by Troy Lester, his father and next friend, seeking recovery of damages for personal injuries alleged to have been sustained by said minor plaintiff on September 28, 1940. Plaintiff's injuries resulted from the overturning of an automobile owned and operated by one Russell Durham, by whom plaintiff Lester was employed as a farm hand. Durham was alleged to have been intoxicated with liquor sold to him by defendants Bugni and Donelson in their respective taverns on that day which proximately caused such injuries and damage to the plaintiff.

The case was tried by a jury and a verdict was rendered in favor of plaintiff in the sum of $4,250. The court denied defendants' motions for a directed verdict, for judgment notwithstanding the verdict and for a new trial, and judgment was entered on the verdict, from which judgment all of said defendants have perfected their appeal to this court.

From the abstract and record it appears that the facts in the case were substantially as follows: James Lester's home was in Girard, Illinois. On September 26, 1940, he was employed by Russell Durham as a farm hand and was taken to the latter's farm located about fifteen miles northwest of Carlinville and about three miles north of Palmyra, Illinois. On the evening of September 27, Durham's Ford automobile had run out of gasoline about a mile and a half from his home and was left standing on the side of the highway overnight. During the next morning, Durham and Lester shocked beans on the farm and in the afternoon Durham caused Lester to fill a ten gallon can with gasoline and take it to the car. Durham, accompanied by Lester, then drove to Carlinville where Durham first obtained an eight dollar parity check from the farm office and then went to defendant Peter Bugni's tavern in Carlinville, where he cashed the check.

Lester fixed the time at three o'clock and Durham at four or five o'clock of the afternoon. Durham bought two bottles of beer for himself and Lester which they drank. Lester testified that subsequently Durham played cards with some man who was a stranger to Lester; that this man suggested that the three chip in and buy a quart of wine, which was done. Lester did not drink the wine as he did not like it, and it was consumed by Durham and the third man; that Durham drank more beer and whiskey with other persons but that Lester drank no more intoxicants. Durham and defendant Bugni denied that Durham drank more liquor or that he was intoxicated.

Lester testified that he had asked Durham to take him home, but that Durham refused and pushed him aside; that at about eight o'clock they left Bugni's tavern, and Lester again requested that if Durham would not go home, he take Lester to his home at Girrard, but was told that he would do so on the following afternoon. Lester stated that he could not take

the Interurban to Girard because he had no money; that Durham drove out of Carlinville to the Silver Moon tavern which was owned and operated by defendant Donelson under a lease from defendant Bates who owned the property, which ownership, leasing and operation is admitted by said defendant. Lester testified that he again asked Durham not to stop at the Silver Moon, but was told that Durham would stop and have another drink; that they arrived there about 8:30 p.m. where Lester said that Durham drank more bottled beer and some whiskey. Others testified to the drinking and to the intoxicated condition of Durham, which was denied by the defendants and certain of their witnesses.

At about 10:30 p.m. Lester again asked Durham about going home which the latter refused to do, whereupon Lester went out to the Durham car and got into the back seat and went to sleep. At midnight, Durham left the tavern, but did not awaken Lester, who testified that he only awakened sufficiently to know that the car was moving and remembered nothing more until after he was in the hospital on the following day. It appears that he slept in the car until the time of the injury.

Durham drove to Palmyra and then over a level black-top State-Aid road known as Emmerson Road running east from Palmyra. At a point a quarter of a mile east, there were railroad tracks running in a northerly and southerly direction across the road. When Durham had reached a point about one block east of the tracks, he turned his car over on the north edge of the highway, so that afterwards the front wheels were facing back in a southerly direction on the north edge of the road. Durham testified that when he crossed the tracks, his front wheels "shimmied" and continued to do so until he turned over when going at a speed of 20 or 25 miles an hour. No brakes were applied by Durham. He was familiar

with the road between Palmyra and his home. Before the car turned over, there had been no conversation between Durham and Lester, who had been sleeping.

Durham testified that on the way into Carlinville that afternoon, he had car trouble due to a short in wires, which he overcame by "jiggling" the wires and again near the Silver Moon tavern, he stopped for 20 or 30 minutes on account of a short circuit in the ignition switch, which he again overcame by "jiggling" the wires; that otherwise the car was in good mechanical order except that the front wheels were loose on that afternoon. He had no other trouble until the time when the car "shimmied" and turned over. He did not remember whether he had a speedometer on the car.

After the car was turned over, Durham went to the home of a Mr. Nevins nearby for help and to assist in moving the injured plaintiff from the car. Marvin Thurston and Duane Mitchell, witnesses, also came by in a car, and the four turned Durham's car back onto its wheels. They then placed Lester in the back seat of Mitchell's car and took him to the Stults Funeral Home, from whence he was taken in an ambulance to the hospital at Carlinville. The witnesses who assisted Durham testified that in their opinion he was intoxicated, basing the same principally on the strong odor of liquor upon his breath and their statements that he staggered. One of the witnesses operated a grocery store near-by and the other was a student who attended Carbondale Normal School. When Durham called at Nevins' home for help, it was about one or one thirty o'clock in the morning.

While it may be conceded that the question of Durham's purchase of liquor and subsequent intoxication was controverted by witnesses for the respective parties, the greater weight of the testimony seems to be that he had drank liquor freely at both taverns and

was intoxicated prior to and at the time of plaintiff's injuries.

Plaintiff sustained a fracture of his fifth and sixth cervical vertabrae which caused a paralysis to his right leg and foot, to his right arm and some paralysis in his left leg; a laceration of his ear and some subsequent deformity to the right hand. He remained in the hospital for seven weeks, during which time his lower extremities were paralyzed. He was moved to his home with his neck placed in a cast, and remained in bed for six months. Thereafter, he was able to move about the house by pushing a chair. At the time of the trial, one year after the injury, his right limb and foot, hand and forearm were paralyzed, which condition the treating physician, Dr. Phinney, gave his opinion as being permanent and as resulting from the fractured fifth and sixth cervical vertabrae which caused the paralysis. There is no dispute as to the nature and extent of the injuries or any claim that the amount of the verdict was excessive.

The appellants have assigned five alleged errors on the part of the trial court, *viz*: that the verdict is contrary to law; that the verdict is contrary to the evidence; that the court erred in refusing to grant defendants' motions for a directed verdict of not guilty interposed at the close of the plaintiff's testimony, and of all the testimony, and erred in refusing defendants' instructions numbered 1 and 3.

Concerning the alleged error in refusing instructions 1 and 3 it may be said that the courts of review of this State have uniformly held that a failure to set forth in the abstract all of the instructions precludes the appellant from predicating error upon the giving, refusal or modification of particular instructions. *People v. Heywood,* 321 Ill. 380, 384, 152 N. E. 215; *People v. Goodman,* 283 Ill. 414, 119 N. E. 429; *Reavely v. Harris,* 239 Ill. 526, 88 N. E. 238; *City of Roodhouse*

v. *Christian,* 158 Ill. 137, 41 N. E. 748; *People v. Vickers,* 326 Ill. 290, 292, 157 N. E. 205; *Fugett v. Murray,* 311 Ill. App. 323, 332, 35 N. E. (2d) 946.

In the instant case none of the instructions were set forth in the appellants' abstract. The question of whether a particular instruction is erroneous must be considered in connection with all the other instructions given by the court, as the instructions on a given subject are to be taken and considered as a series. Any alleged errors in the record relied upon for reversal must clearly appear on the face of the abstract, as it is not the province of the court to search the record for the purpose of discovering errors on which to predicate a reversal. *People v. Heywood, supra.* Appellants' motion in the lower court to set aside the judgment and grant a new trial is referred to but not set forth either *verbatim* or in substance in the abstract. The motion for a new trial, together with ruling of the court thereon not having been preserved in the abstract nor assigned as error herein, the question of whether or not the verdict is against the manifest weight of the evidence and any alleged errors in the giving or refusal of instructions, is deemed by this court to have been waived. An assignment of error simply setting forth that the verdict is contrary to law and that the verdict is contrary to the evidence, without further pointing out specifically such alleged errors is insufficient in the absence of such motion for a new trial setting forth specifically any such alleged errors, the ruling of the court thereon and the assignment of errors in the abstract, to preserve the same for review by this court.

It, therefore, only remains for this court to pass upon the alleged errors in denying motion for a directed verdict of not guilty at the close of the plaintiff's evidence and of all the evidence. In passing upon this motion, and the denial of the defendants' motion for judgment notwithstanding the verdict, this

court can only determine whether or not there is any evidence in the record, which, with legitimate inferences therefrom viewed in the light most favorable to the plaintiff, tends to sustain the allegations of the complaint or some count thereof.

It is insisted that the plaintiff, in order to establish his cause of action, must show that he was in the exercise of ordinary care and caution to avoid the injury complained of and that no proof of such care appears in the record.

It appears from the evidence as abstracted that the plaintiff, a boy of the age of 17 years, had repeatedly importuned his employer Durham, to leave defendant Bugni's tavern and drive the plaintiff to his home; that plaintiff had no money remaining with which to buy an interurban ticket to his home; that he was told by his employer Durham that the latter would take him to his home on the day following; that the plaintiff repeatedly sought to have Durham continue to his home or leave defendant Donelson's tavern and drive home; that he finally left the tavern and went into Durham's automobile, and slept in the back seat of the automobile and that he awakened sufficiently to know that Durham was starting the car; that he, the plaintiff, slept until the time that the automobile was overturned after midnight and the plaintiff was injured; that his employer's automobile was not in all respects in good repair but was being operated and in use at and prior to the time of the plaintiff's injuries. We have purposely given the substance of the testimony somewhat at length and we are unable to say therefrom, as a matter of law, that the plaintiff was not in the exercise of ordinary care for his own safety, in view of his age, the relationship that existed between him and Durham, a man of mature age, and of all the surrounding facts and circumstances as shown by the evidence. We hold that the same became a question of fact for the jury to determine from such evi-

dence and legitimate inferences therefrom, viewed in the light most favorable to the plaintiff, and that the jury was justified in its finding therefrom that the plaintiff was in the exercise of due and ordinary care for his own safety. *Fugett v. Murray, supra; Blumb v. Getz,* 366 Ill. 273, 8 N. E. (2d) 620; *Streeter v. Humrichouse,* 357 Ill. 234, 238; *Rembke v. Bieser,* 289 Ill. App. 136, 6 N. E. (2d) 900. There is an abundance of evidence in the record which would justify the jury in finding that the driver of the car, Durham, was intoxicated from liquor sold to him in the taverns operated by Bugni and Donelson, which latter tavern was admittedly owned by defendant Bates, and to justify as a reasonable inference therefrom that the intoxicated condition of Durham proximately resulted in the overturning of his car on the public highway with which he was shown to be familiar, resulting in serious and permanent injuries to and damages sustained by the plaintiff and assessed by the verdict of the jury. The question of proximate cause of said injuries became under the evidence herein a question of fact for the jury. *Schulte v. Schleeper,* 210 Ill. 357, 71 N. E. 325; *Haw v. 1933 Grill,* 297 Ill. App. 37, 17 N. E. (2d) 70; *Klopp v. Benevolent Protective Order of Elks,* 309 Ill. App. 145, 33 N. E. (2d) 161; *Triggs v. McIntyre,* 215 Ill. 369, 372, 74 N. E. 400.

It may be conceded also that when the employer's check was cashed at Bugni's tavern, the plaintiff paid part of the cost of wine consumed by his employer, and his attitude in relation thereto and his subsequent actions were such as to leave the question of contributory negligence or provocative conduct as a question of fact to be determined by the jury. Ordinarily, the doctrine of contributory negligence is not applicable to a Dram Shop case. *Hyba v. C. A. Horneman, Inc.,* 302 Ill. App. 143, 23 N. E. (2d) 564; *Spousta v. Berger,* 231 Ill. App. 454; *Thompson v. Wogan,* 309 Ill. App. 413, 33 N. E. (2d) 151.

While statutes, penal in character, are ordinarily to be strictly construed, it has been frequently held that the Dram Shop Act under provisions of which plaintiff's right of action was prosecuted, is remedial in character and should be so construed as to suppress the mischief involved and advance the remedy therein provided. *Hyba v. C. A. Horneman, Inc., supra; Klopp v. Benevolent Protective Order of Elks, supra.*

The jury, whose province it was to determine the foregoing issues and questions of fact determined the same in favor of the plaintiff and against the defendant and we hold that the evidence in the record tended to prove the material elements of plaintiff's cause of action as alleged in the complaint, and amply justified the verdict of the jury herein.

From a consideration of all errors assigned by the defendants we find that substantial justice was done between the parties and that no reversible error appears in the record. The judgment of the circuit court of Macoupin county is therefore affirmed.

*Judgment affirmed.*